## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

v.                      **CASE NO. 21CR00599-RBW**

**DONNIE DUANE WREN,**

      **Defendant.**

_____/

## DONNIE WREN'S SENTENCING MEMORANDUM AND REQUEST FOR A DOWNWARD VARIANCE

DONNIE WREN, through undersigned counsel, and pursuant to 18 U.S.C. § 3553(a), submits the following memorandum in support of his request for a downward variance.

## INTRODUCTION

Mr. Wren stands before this Court having been convicted, after trial, of a fraction of the offenses brought against him by the government. He asks this Court to vary below the advisory guidelines because these guidelines do not, indeed, cannot provide a just sentence for his conduct that day. Though a District of Columbia jury convicted him of a handful of the charges, and to be sure, Mr. Wren engaged in wrongful behavior that day, the events at the Capitol on January 6 were unique in their causes and

1

consequences.

Mr. Wren, like many, sincerely believed that the 2020 election was being stolen. He believed that he was protesting in the name of liberty and freedom. His motives, however misguided others may feel, were based on those values that this country celebrates and enshrines. What is more American than fervently defending democracy—even from one's own government—and perhaps especially then? And how ought we to punish someone who, in the midst of such a protest, engaged in minor criminal behavior that was consequential *only* because it was replicated by thousands?  To properly answer these questions this Court must confront issues central to what it means to be American.  And in recognizing Mr. Wren's humanity, he asks this Court to impose a sentence outside the advisory range and below the government's anticipated request. Mr. Wren's submits that a sentence of thirty-six months (**36**) probation would be "a sentence sufficient, but not greater than necessary" to achieve justice in this case.

On one hand, the Court could examine, in isolation, the actions of Mr. Wren, who entered and remained on restricted grounds and then briefly placed his hands on the police shield of an unknown person.  Alone, his actions were insignificant and would hardly be worthy of a lengthy term of

imprisonment. It is **only** because he was a part of an unexpectedly large throng of people that day that his actions had any meaningful impact on society. But his participation in that group also mitigates his culpability. He acted like thousands of others did in a prolonged moment of uncertainty, among thousands of like-minded Americans, in a unique circumstance rarely faced by this country. No right-minded person believes that sending Mr. Wren to a lengthy term of imprisonment will help to stop another January 6 from occurring, nor is such a sentence necessary for Mr. Wren, who is among the most stable, hard-working, and productive members of society present at the Capitol that fateful day. Such a sentence recognizes the humanity of Mr. Wren as an individual, not merely as one of countless rioters. Such a sentence is commensurate with this court's responsibility under 18 U.S.C. 3553(a). And such a sentence is commensurate with the grace with which the victors ought to treat the vanquished. Such a sentence is, in this case, thirty-six (36) months of probation.

### 1.   **The Court Should Vary Downward Based Upon Mr. Wren's History and Characteristics.**

On January 6, 2021, thousands of people came to Washington, D.C., at the request of the then-President of the United States, to attend the "Stop the Steal" rally at the Ellipse. There, several prominent people spoke. The

speakers included, among others, the President, sitting members of Congress, a law professor, the President's attorney, and the Texas Attorney General. And, consistent with the theme of the rally, the speakers complained about a stolen election. At the end of the rally, the President urged the attendees to go to the Capitol to "make your voices heard." Mr. Wren was one of those in attendance. He was among the thousands who walked to the U S Capitol that day. Mr. Wren is deeply remorseful of his conduct that day and will spend the rest of his life regretting his actions.

To be clear, however, Mr. Wren *did not* travel from Athens, Alabama, to Washington, D.C., to march to the Capitol or to unlawfully enter the building, and certainly not to obstruct law enforcement officers. Instead, and as he has consistently stated, he came from Alabama to attend what he believed would be President Trump's last rally the next day.

There is no dispute that Mr. Wren entered onto Capitol Grounds, acted inappropriately by climbing scaffolding, and, while in the crowd, impeded a member of a police shield line who was just trying to do his/her job in moving the protesters off the Upper West Terrace. While Mr. Wren's conduct was wrongful, it is important to note that he did not carry

4

a weapon or even convert an everyday item into a weapon, nor did he punch, kick, or spray any officer with an irritant. He did not come dressed in or carrying any form of tactical gear.  He did not conceal his identity with a mask, scarf, or hat.  On the contrary, he wore a work jacket with his company logo which readily identified him.   And he had *no preconceived intent* to go to the Capitol or engage with law enforcement officers that day.

Mr. Wren's actions on January 6th were clearly an aberration. Despite a challenging and difficult childhood growing up poor in Mississippi, he has had only relatively minor scrapes with the law. PSR at ¶¶ 58-60. At an early age, Donnie's father frequently used alcohol and subjected Donnie to "butt whoopings." PSR at ¶ 72. The family struggled financially, with food and shelter not always guaranteed. PSR at ¶ 59. Despite these hardships, and aside from these minor offenses, (the last occurring over 10 years ago in 2011), Donnie Wren has, until the events of January 6th, led a relatively law-abiding life.

Moreover, notwithstanding the instability of his childhood and achieving only a 10th grade education, Mr. Wren has forged ahead, with a stable and productive work history in a field that benefits all people. For the last seventeen years, Mr. Wren has worked for Geo-Solutions,

Inc., a soil, and groundwater environmental remediation company. There, he works on a custom-made, long reach excavator that is capable of digging 90 feet below the ground surface. He is currently working on an Everglades restoration project for the South Florida Water Management District. This vital project, in particular, will ensure clean drinking water for generations for the South Florida community of which counsel and his family are members. By all accounts, Mr. Wren is an indispensable part of this project.

As his direct supervisor for the past nine (9) years, Mr. Lipnic, writes in his letter to the Court:

"Donnie currently operates a custom long reach excavator that weighs 280,000 lbs. He also serves as foreman and is respected by his peers. All his coworkers speak highly of him and strive to reach his level of accomplishments within the workplace. I've personally been his project manager on numerous large scale environmental projects, including his current one, which is a vital everglades restoration project for South Florida Water Management District. I can honestly say Donnie is everyone's first pick to be on their project site. Not just because of skillsets, but because he listens well, doesn't cause drama, and keeps a cool head even during tough construction projects. (Exhibit A-Letter from Project Manager Marshal M. Lipnic).

Mr. Pete Maltese, the Vice President of Field Operations for Geo-Solutions, Inc. told probation that Donnie Wren is the "best person" he has. PSR at ¶ 99. He reiterated this to undersigned counsel in a telephone conversation. In his letter to the Court he states, after listing Mr.Wren's many accomplishments with the company:

On the personal side, Donnie has earned a reputation as being a quiet, reliable, hard-working employee with significant talent. He works well with other employees and is a pleasure to have on any crew. Donnie is a truly caring person who will help anybody with anything, that's just who he is. I am honored to have him working for our Company.

6

It is important to note that the company is fully aware of Mr. Wren's court case and have welcomed him back to work notwithstanding his arrest and subsequent jury verdict.

As the Court well knows, 18 U.S.C. § 3553(a) mandates that a court "impose a sentence sufficient, but not greater than necessary, to comply with" federal sentencing goals by looking to the statutory factors listed under § 3553. And given Mr. Wren's challenging childhood, his lack of formal education, his stellar and stable long-term work history, his minimal prior involvement with the criminal justice system, and remorse for his actions, and his aberrational conduct on January 6th all warrant a downward variance from the advisory guideline range.

## 2. The Court Should Vary Downward Because the Guidelines Overstate Mr. Wren's Culpability.

A downward variance is also warranted because the advisory guidelines wildly overstate Mr. Wren's culpability. Mr. Wren was found guilty in Count 2 of committing Civil Disorder under 18 U.S.C. § 231(a)(3), but the USSC has not indexed the offense of Civil Disorder to any particular guideline. In that situation, one must apply the most analogous offense guideline, which in this case is USSG § 2A2.4. However, pursuant to USSG § 2A2.4(c)(1), *if* the conduct constituted aggravated assault, apply USSG § 2A2.2. Notwithstanding, USSG §

2A2.2 clearly overstates his culpability and recommends a sentence far greater than necessary under 18 U.S.C. § 3553(a).

Similarly, Mr. Wren was found guilty in Count 4 of Assaulting, Resisting, or Impeding Certain Officers under 18 U.S.C. § 111(a)(1). The guideline applicable to Count 4 is found in USSG § 2A2.4. Again, pursuant USSG § 2A2.4(c)(1), *if* the conduct constituted aggravated assault, § 2A2.2 is applicable.

While the calculation of both felony offenses seemingly leads to USSG § 2A2.2 and its conclusion of aggravated assault, we know this is contrary to logic and to the evidence adduced at trial.

The federal assault statute incorporates the common-law definition of assault as (1) "a willful attempt to inflict injury upon the person of another" or (2) "a threat to inflict injury upon the person of another which, when coupled with an apparent present ability, causes a reasonable apprehension of immediate bodily harm." *United States v. Dat Quoc Do*, 994 F.3d 1096, 1099–100 (9th Cir. 2021); *see also United States v. Cua*, No. CR 21-107 (RDM), 2023 WL 2162719, at *5 (D.D.C. Feb. 22, 2023).

The evidence at trial clearly indicated that Mr. Wren placed his

hands on a police shield for less than 20 seconds.   In doing so, he did not willfully attempt to inflict injury, nor did he threaten to inflict injury upon the officer—the elements required for assault.

In contrast to simple assault, USSG § 2A2.2 defines "aggravated assault" to mean a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (*i.e.*, not merely to frighten) with that weapon; (B) serious bodily injury; (C) strangling, suffocating, or attempting to strangle or suffocate; or (D) an intent to commit another felony. USSG § 2A2.2, comment (n.1). Assuming *arguendo* that Mr. Wren committed even a simple assault, he by no means committed an aggravated assault.

Mr. Wren did not use a dangerous weapon, inflict serious bodily harm, or strangle or suffocate anyone (or attempt those acts). Therefore, the only basis for § 2A2.2 is if Mr. Wren committed any assault with "an intent to commit another felony." USSG § 2A2.2, comment (n.1).

But the Civil Disorder offense cannot be "another felony" for purposes of the cross-reference at § 2A2.2.  Mr. Wren's placing his hands on a police shield for less than 20 seconds simply cannot constitute both the assault ***and*** the "other felony" of Civil Disorder, particularly where, as here, the Grand Jury alleged each offense occurred at the same exact

time, 4:20p.m.  For an offense to properly be considered "aggravated" or more serious, there must logically be evidence that shows that Mr. Wren intended some other crime. The evidence as admitted at trial does not show that Mr. intended to commit a felony other than Civil Disorder when he placed his hands on a police shield on the Upper West Terrace.[2]

---

[2] Indeed, the crime of Civil Disorder itself does not require that the defendant *intend* to commit a civil disorder. A court in this district recently found that the commission of Civil Disorder under 18 U.S.C. § 231(a)(3) requires the government to prove that the defendant "commited, or attempted to commit, an act with the intent to obstruct, impede, or interfere with law enforcement officers who were lawfully carrying out their official duties incident to a civil disorder." *United States v. Reffitt*, 2022 U.S. Dist. LEXIS 81138 at 16 (May 4, 2022) (Friedrich, J.).

The Aggravated Assault guideline is clearly intended to apply when a defendant has a larger, felonious purpose, which is not borne out by the evidence here. The brevity of Mr. Wren's conduct also matters. He put his hands against a police shield for less than half a minute.

Judge Berman Jackson confronted this same issue in *United States v. Hamner*, 21-CR-00689-ABJ, and agreed with this position. A brief summary of the *Hamner* facts from the government's sentencing memorandum is illustrative: "On January 6, 2021, Hamner was in Washington D.C.  Once on restricted grounds of the U.S. Capitol, Hamner opportunistically attacked the police line, pulling away barricades and then assisted to ram a large billboard, a dangerous weapon when used as Hamner did, directly onto police officers protecting the entry point . . .." *United States v. Hamner*, 21-CR-00689 (ABJ), DE 38:12).

On May 17, 2022, Hamner pled guilty to Count Two of his indictment that charged Civil Disorder and Aiding and Abetting. (DE 28:1-2).  In *Hamner*, the government alleged he assaulted Capitol Police and Metropolitan Police Officers by violently pushing a large and heavy metal sign onto the line of police officers. (*Hamner*, DE 43:46) (AUSA: "I want to be clear: The sign did not, as the memo put it, lumber towards

the officers. It was lifted, it was carried, it was pushed, and it was heavy, and it was huge. The video exhibits capture, along with the photographs, Mr. Hamner's posture and his effort. He's putting his back and his legs into it.). According to the government, Hamner's conduct reflected a threat that caused reasonable apprehensions of fear and a "willful attempt to inflict injury upon" the officers. (*Hamner*, DE 28:20).

In *Hamner*, unlike here, the government agreed that USSG § 2A2.4-Obstructing or Impeding Officers applied. (*Hamner,* DE 28:24). But the government asserted that USSG § 2A2.4(c)'s cross-reference should be used. (*Hamner,* DE 28:24). As noted above, § 2A2.4(c) provides (1) If the conduct constituted aggravated assault, apply § 2A2.2 (Aggravated Assault). The government argued, among other things, that Hamner's assault "involved . . . an intent to commit another felony." (*Hamner,* DE 28:21) ("Hamner's felonious assault 'involved . . . an intent to commit another felony.' [] Here, the interference with police

during a civil disorder in violation of 18 U.S.C. § 231(a)(3) involved the

intent to commit the felony violation of assaulting, resisting, or impeding

certain officers (18 U.S.C. § 111(a)(1) and (b))").

Judge Berman Jackson disagreed:

It strikes me that if the Commission is asking: Did you commit the assault with the intent to commit some other offense? It didn't mean with the intent to commit that exact same assault, just charged differently. They could have easily defined 'another offense' as any offense with any different elements that's a different offense, but they didn't. It's also important to note that the cross reference says you go to aggravated assault if the assault on the police officer involved the intent to commit another felony, not the same intent needed to satisfy the elements of another felony, not that it was committed during the commission of another felony. *This suggests that the guideline is meant to cover just the situation in the cases that you cited, where the assault on the police officer is intended to facilitate or further or advance or succeed in the commission of or evasion of apprehension for a second, different crime.*

(*Hamner*, DE 43:20-21) (emphasis added).

Ultimately, Judge Berman Jackson held:

Therefore, given the fact that the showing necessary for the application of the cross reference under subsection A has not been made, given the government's inability to produce evidence to establish the defendant's intent to cause bodily injury by a preponderance of the evidence, given the circularity involved in the government's proposal, that I find that subsection D applies, and that is that the assault, which is the offense of conviction, involved an intent to commit another felony when the other felony is the exact same assault

13

that likely wouldn't be a felony unless it was committed with
the intent to commit another felony. And finally, at best, the
cross reference is ambiguous. And under such circumstances
the Rule of Lenity requires the adoption of the definition that
favors the defendant.

(*Hamner*, DE 43:23-24).

In summary, Hamner pled guilty to the same offense to which Mr.
Wren was found guilty—18 U.S.C. § 231(a)(3)—Civil Disorder. While Mr.
Wren was also found guilty of 18 U.S.C. § 111(a), the operative issue is
the same—whether an assault that formed the basis of the civil disorder
offense may be deemed "another felony" to "aggravate" the offense. Judge
Berman Jackson, as discussed above, ruled no. This Court should do so as
well for the reasons cited by Judge Berman Jackson.[3]

---

[3] Judge Berman Jackson sentenced Hamner to 30 months' imprisonment
based upon the following findings: a Base Offense Level of 10, a three-
level upward adjustment for physical contact, a two-level downward
adjustment for acceptance of responsibility, and a Criminal history
Category of V which led to a range of 24-30 months. (*Hamner*, DE 43:22-
24). The court found that Hamner had five prior felony convictions,
several involving violent assaults on women. *Id.* at 50. The court also
found there were "ongoing problems with compliance with [Hamner's]
conditions of supervision." *Id.* Judge Berman Jackson found that "the
record reflects a current theme of disrespect for law enforcement, fleeing
from arrest, resisting arrest, and disrespect for courts in general when
you bragged about that in this case. *Id.* Finally, the court noted that upon
his arrest, Hamner told the officers, "You're lucky I ain't running and
making you go through hell right now. Just look at my rap sheet. I'm

18 U.S.C. § 3553(a) makes clear that the statute not only allows but requires an independent judicial evaluation of the seriousness of the offense and "just punishment," 18 U.S.C. § 3553(a)(2)(A), separate and apart from the "nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), and the requirements of the guidelines, 18 U.S.C. § 3553(a)(4). Under section 3553(a), a court may vary downward based upon the guideline overstating the defendant's culpability. *See, e.g., United States v. Cavera,* 550 F.3d 180, 192 (2d Cir. 2008) ("a district court may find that . . . there is a wide variety of culpability amongst defendants and, as a result, impose different sentences based on the factors identified in § 3553(a).").

Under the PSR, using USSG §2A2.2 (Aggravated Assault), Mr. Mr. Wren's advisory guideline range is **46-57** months. By comparison, using USSG § 2A2.4 (Obstructing or Impeding Officers) without applying the cross-reference, with a three-level increase for physical contact, and a two-level decrease for role in the offense, his guideline range would be **8-14** months in Zone B. Assessing Mr. W r e n 's relative culpability,

---

a runner and I'm a fighter, but ain't that today because I know that I've been doing right." *Id.*

the Court should consider this significant difference in fashioning a just and reasonable sentence.

### 3. The Court Should Vary Downward Because Mr. Wren's Conduct is Not Deserving of a Prison Sentence.

Mr. Wren did not bring weapons with him when he came to Washington on January 6. Instead, he packed a couple of sandwiches. He did not bring body armor with him, zip ties, or radio equipment. He did not bring a uniform, gas mask, or truncheon. He came to watch the president speak, as he was invited to do. Mr. Wren's lack of preparation for any assault helps to show that he was not planning to engage in any criminal actions that day. This absence of premeditation certainly mitigates his culpability. More importantly, the fact that Mr. Wren did not bring a weapon demonstrates that his offenses were merely those of opportunity—and an opportunity unique in this country's history. Had nearly empty pepper spray cans not been tossed about, Mr. Maly may never have even held a weapon.

Moreover, Mr. Wren did not engage in physical acts of violence. The jury's verdict confirmed this, and the Court recognized it by allowing Mr. Wren to remain free pending sentencing. Mr. Wren was literally only at the front of the mob for seconds.

16

And rather than pound against the line of officers, Mr. Wren quickly retreated.  He left. He did not stay in the crowd. He did not join the throng pushing against officers, shouting vulgarities.  He did not grab officers by their masks or shields.  He did not assault them with bicycle racks or flag poles.  He did not throw objects at them or bludgeon them.  He left.

Faced with perhaps the most violent actions that day, Mr. Wren knew that he should not remain there. And he left. He did what we would want people to do. When he saw a line of police officers with shields moving the crowd, he turned around. He did so immediately.[2]   He acted consistent with those around him who were not engaging in overt acts of violence. When it became apparent that he should leave and that being at the Capitol was unlawful and wrong, he left.

_____

[2] Mr. Wren is short of stature. There is no evidence he could have seen the line of officers before he was nearly upon them. And the available evidence shows that he was on the Upper West Terrace only moments before the shield line formed and retreated quickly after the encounter to the portico, further extricating himself from any skirmish.

**4.      Based on the Foregoing, the Court Should Vary Downward in Fashioning a Just Punishment for Mr. Wren.**

In imposing "just punishment" for an offense, a sentencing court should not disregard the additional penalties and hardships that will accompany Mr. Wren's conviction—the loss of his civil rights and perhaps his continued ability to work—and his low risk of recidivism. *See United States v. Urbina*, 2009 WL 565485, *3 (E.D. Wis. Mar. 5, 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history, and strong family ties); *United States v. Cabrera*, 567 F. Supp. 2d 271, 279 (D. Mass. 2008) (granting variance because defendants "with zero criminal history points are less likely to recidivate than all other offenders").  Finally, in considering a variance in this case, this Court should consider the length of time, 10 years, that Mr. Wren—who is 44 years old—abstained from criminal conduct prior to his commission of the instant offense. *United States v. Ward*, 814 F. Supp. 23, 24 (E.D. Va. 1993) (granting departure based on defendant's age as first-time offender since guidelines do not "account for the length of time a particular defendant refrains from criminal conduct" before committing his first offense).

Mr. Wren recognizes he committed offenses for which he has no excuse. But given his challenging childhood, stable long-term work

history, lack of substantial prior involvement with the criminal justice system, and remorse for his actions, his aberrational conduct on January 6th warrants a downward variance from the advisory guideline range.

Respectfully Submitted,

By: _George T. Pallas, P.A._
Counsel for Donnie Duan Wren
2420 SW 22nd Street
Miami, FL 33145
305-856-8580
305-860-4828 FAX
george@pallaslaw.com

## CERTIFICATE OF SERVICE

I HEREBY certify that on **October 10, 2023**, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

Respectfully Submitted,

By:/s/ *George T. Pallas*
GEORGE T. PALLAS, ESQ.

# EXHIBIT A



1250 Fifth Avenue, New Kensington, PA 15068
**T**  724-335-7273   **F**  724-335-7271
**www.geo-solutions.com**

9/20/2023

**RE:    Letter of Recommendation**
         **Donnie Duane Wren**

To Whom It May Concern:

I have served as a Project Manager for Geo-Solutions for the past 9 years. We are a specialty contractor that works throughout the United States, Canada, and sometimes internationally. When I started for the company, I heard the name Donnie Wren within a few days. His name is known by everyone in our company because of his work ethic and technical skill level with our largest pieces of equipment.

Donnie currently operates a custom long reach excavator that weighs 280,000 lbs. He also serves as foreman and is respected by his peers. All his coworkers speak highly of him and strive to reach his level of accomplishments within the workplace. I've personally been his project manager on numerous large scale environmental projects, including his current one, which is a vital everglades restoration project for South Florida Water Management District. I can honestly say Donnie is everyone's first pick to be on their project site. Not just because of skillsets, but because he listens well, doesn't cause drama, and keeps a cool head even during tough construction projects.

I have spent a substantial amount of time with Donnie on the jobsite, and some afterhours sharing a bite to eat. He's always been easy-going and easy to talk to. In summary, he is a well-respected person who keeps to himself.

Donnie has earned and maintained several certifications over the years, including:

- OSHA 40 hour Hazardous Waste Operations and Emergency Response (HAZWOPER) training
- OSHA 8 hour HAZWOPER refresher training (annually)
- OSHA 10 hour Construction Safety training
- OSHA 8 hour HAZWOPER Supervisory training
- MSHA New Miner training
- Defensive Driving Course
- Heavy Equipment Certifications for tractors, loaders, dozers, excavators, skid steers, drills, hydraulic cranes, forklifts, aerial lifts, etc.

Please do not hesitate to call me at 814-659-3830 if you have any questions or comments.

Respectfully,
**Geo-Solutions, Inc.**



Marshal M Lipnic
Project Manager

# EXHIBIT B



1250 Fifth Avenue, New Kensington, PA 15068
**T**  724-335-7273   **F**  724-335-7271
**www.geo-solutions.com**

June 19, 2023

**RE:    Letter of Recommendation**
        **Donnie Duane Wren**

To Whom It May Concern:

GSI is a specialty construction company that performs work throughout the United States and abroad. Donnie Duane Wren is an employee of Geo-Solutions, Inc. (GSI), and has worked with the Company for over 17 years. He is currently working as a Foreman on a custom-made, long reach excavator that is capable of digging to 90 feet below the ground surface. Donnie is a top performer in the Company and has a track record of mentoring others to perform at their best.

Donnie has earned and maintained several certifications over the years, including:

- OSHA 40 hour Hazardous Waste Operations and Emergency Response (HAZWOPER) training
- OSHA 8 hour HAZWOPER refresher training (annually)
- OSHA 10 hour Construction Safety training
- OSHA 8 hour HAZWOPER Supervisory training
- MSHA New Miner training
- Defensive Driving Course
- Heavy Equipment Certifications for tractors, loaders, dozers, excavators, skid steers, drills, hydraulic cranes, forklifts, aerial lifts, etc.

His extensive training is instrumental in performing our specialty work.

On the personal side, Donnie has earned a reputation as being a quiet, reliable, hard-working employee with significant talent. He works well with other employees and is a pleasure to have on any crew. Donnie is a truly caring person who will help anybody with anything, that's just who he is. I am honored to have him working for our Company.

Please do not hesitate to call me at 412-952-0373 if you have any questions or comments.

Respectfully,
**Geo-Solutions, Inc.**

Pete Maltese
Vice President of Field Operations