**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-599-RBW** |
| **THOMAS HARLEN SMITH,** | |
| **Defendant.** | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Thomas Harlen Smith to 168 months of incarceration, a $19,495 fine, $2000 in restitution, and a special assessment of $920. This recommendation reflects the midpoint of guidelines offense level 33, criminal history category II, which has a range of 151-188 months. The fine reflects the amount of money Smith raised on GiveSendGo.com as a result of this case.

## I.   INTRODUCTION

The defendant, Thomas Harlen Smith, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States

1

Smith escalated the violence against the Capitol and the officers defending it in the Tunnel and on the Upper West Terrace. He used his "battle flag"—Smith's characterization—as a weapon when he tried to break a window in the Tunnel. Ex. 811.2. Smith confronted a line of officers attempting to clear the Upper West Terrace ("Terrace") and pushed back against them. He kicked Officer Anthony Rowley in the back, sending him to the ground. And he threw a metal pole at Officer Anthony Campanale, hitting him in the head. When another pole hit the line of officers, Smith said "You deserve that, you piece of shit."

In messages sent on January 6 and shortly after, Smith bragged about "storming the Capitol" and made light of the violence against the officers. In his testimony, Smith falsely claimed that he did not intend on breaking the window in the Tunnel, he did not intend on entering the Capitol, he only pushed the police line to protect rioters who had fallen, he only kicked Officer Rowley to protect a rioter who Rowley was about to attack, he only threw the pole at Officer Campanale to distract him so that Smith could escape, and—perhaps most unbelievably—the incriminating messages sent from his phone were not his words, but those nearby rioters captured accidentally on voice-to-text. The Court found aspects of Smith's testimony to be "totally disingenuous." 5/5/23 Trial Tr. at 19.

---

Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

The government recommends that the Court sentence Smith to 168 months of incarceration, which is the midpoint of the advisory Guidelines' range of 151-188 months for his convictions of violating 18 U.S.C. § 1512(c)(2), 18 U.S.C. § 111(a) and (b), 18 U.S.C. § 231(a)(3), 18 U.S.C. §§ 1752(a)(1, 2, and 4) and (b)(1)(A), and 40 U.S.C. §§ 5104(e)(2)(D and F). A 168-month sentence reflects the gravity of Smith's conduct, punishes his repeated and escalating assaults on officers, and deters the dishonesty under oath that he exhibited throughout his testimony.

## II.   FACTUAL BACKGROUND

### A.   The January 6, 2021 Attack on the Capitol

On January 6, 2021, hundreds of rioters attacked the United States Capitol in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. The attack resulted in substantial damage to the Capitol, resulting in losses of more than 2.9 million dollars.

### B.   Smith's Role in the January 6, 2021 Attack on the Capitol

Smith traveled to Washington, D.C. from his home in Mississippi, picking up his cousin, Donnie Wren, on the way. On January 6, Smith attended former President Trump's rally by the Ellipse. Then, he climbed a column near the African American History Museum with the outdated Mississippi state flag.

Later, Smith marched to the Capitol from the Ellipse with a mass of Trump supporters. When he arrived on the restricted Capitol grounds at approximately 2:30 p.m., he saw rioters climbing scaffolding to the inauguration stage. Smith, too, chose to climb the scaffolding and

entered the "Tunnel" to the Lower West Terrace doors of the Capitol building. At 3:03 p.m., Smith

pushed toward the front of the rioters and used a flagpole like a spear to try to break the window

next to the door. He thrust his flagpole at the window five times. Ex. 206.1. At trial, Smith testified

that instead of trying to break the window, he was attempting to "tap" on the frame to "get the

attention" of a rioter trapped behind it. See screenshot from Ex. 206.1 below.



*Image 1 – Smith striking window with his "battle flag." (Ex. 206.1)*

Smith then surged forward through the doorway, where he and a mass of other rioters pushed into a line of Metropolitan Police Department ("MPD") officers attempting to hold the door—some of them wearing riot gear. Ex. 202.3; see screenshot below. Smith was sprayed in the face with some form of pepper spray and retreated.



*Image 2 – Smith pushing through Capitol doors (Ex. 202.3)*

Smith then climbed up a railing to the Upper West Terrace. At 4:20 p.m., Smith moved quickly to the front of the rioters to confront a wall of officers using police shields as they advanced to clear the Terrace. Smith held his ground by leaning back into that police line while hold his flag up defiantly. Ex. 329-332.



*Image 3: Smith, behind his cousin, pushing against a police line on the Terrace (Ex. 329)*

A few minutes later, Smith saw an object fly past him and hit an officer. Smith said, "you deserve that, you piece of shit!" Ex. 308.1.

At 4:35 p.m., Smith kicked MPD Officer Anthony Rowley in the back—sending him to the ground. Ex. 315.2; see screenshot below.



*Image 4 – Smith kicking Officer Rowley*

A minute later, after being sprayed again with pepper spray and being feet away from a flash-bang explosion, Smith again approached the police line. He picked up a metal pole-like object and threw it, hitting MPD Officer Anthony Campanale and another officer in their heads. Ex. 315.2 and 316.1. Officer Campanale was not injured because he wore a riot helmet, but he testified that he was concerned that he could have suffered a concussion or worse and that the object was dangerous. See screenshot from Ex. 316.1 below.



*Image 5 – Smith throwing metal pole at Officer Campanale (Ex. 316.1)*

Smith testified that Officer Campanale hit him earlier with his less-lethal impact weapon—which fires a foam projectile. Smith claimed that he threw the metal pole to "distract" Officer Campanale so that he could escape without being hit again with Officer Campanale's impact weapon.

Based on Capitol surveillance footage, Smith was likely trespassing on Capitol grounds for over two hours. Later that day, on Facebook, Smith described the assault on the Capitol, saying: "Patriots stood together and battled the tyrannical cops throughout the entire afternoon." Ex. 811.27.

Smith's Facebook posts and messages on and after January 6 show his intent to "storm the Capitol" and his gleeful attitude regarding violence against police. See Ex. 807.9 below.

**Author** Tommy Smith (Facebook: 100003229929401)

**Sent** 2021-01-06 21:49:54 UTC

**Body** Yes oh, flashbangs are still going off all around us we stormed the capitol got inside but was met with a wall of cops we pushed them back a good ways but in the end they pepper-sprayed the s*** out of us and beat the s*** out of ass for a minute then they got their asses beat for a minute we drugged a couple out nobody got hurt but they did get drug out away from their cop friends which was funny yeah. Trying to make our way away from the capitol now

*Image 6*

Smith's Facebook messages also show that he anticipated violence. For example, on January 6, he told B.J. that he brought a pistol with him to the Capitol. This message (Image 7, highlights added by the government) was not admitted into evidence:



**Messages Between** ███████ **& Tommy Smith**

1/6/2021 ███████ You good brother

1/6/2021 Tommy Smith: Yeah we're good man, had to take and give a little ass kicking to the police but we come out all right. It's been a hell of a day

1/6/2021 ███████: So news are making y'all out to be criminal... how many of y'all did you see armed? I didn't see any

1/6/2021 Tommy Smith: There were no armed people at this rally I had a pistol in my pocket but no nobody ever pulled a gun or use any other weapon against the police all that s*** is made up

*Image 7*

The government's investigation could neither confirm nor refute that Smith had a pistol with him at the Capitol.

Shortly before assaulting the Capitol, Smith posted militaristic memes showing his willingness to commit violence in support of former President Trump's bid to overturn the 2020 election results. *See* Ex. 806.20 ("Americans, willing to cross a frozen river to kill you in your sleep on Christmas. Totally not kidding. We've done it before.") and 809.1 (depicting the "Trump

9

Army" as Spartan warriors, Smith added "Its (sic) coming"). He recruited other "able-bodied" Americans to join his crusade to D.C. to stop the certification. Ex. 811.16. He expressed pleasure in seeing the mob pull an officer away from the police line, Ex. 807.9, and was glad to have the opportunity to "beat cops (sic) asses." Ex. 807.12.

<em>Smith's false testimony at trial</em>

As set forth above, Smith testified concerning his thrusting a flagpole repeatedly against a window in the Capitol that, instead of trying to break the window, he was attempting to "tap" on the frame to "get the attention" of a rioter trapped behind it. The Court found Smith's testimony incredible, stating "I thought he was totally disingenuous and provided false information when he says he wasn't trying to break that window. He was hitting that window hard." 5-5-23 Trial Tr. at 19.

Also as set forth above, Smith testified concerning his assault on Officer Campanale that he threw the metal pole to "distract" Officer Campanale so that he could escape without being hit again with the impact weapon. However, the government's evidence showed that instead of retreating to safety, Smith purposefully took several steps toward the police line, picked up a metal pole, and threw it at Officer Campanale's head. By its verdict on Count Six, the jury found that Smith intentionally assaulted Officer Campanale with a deadly or dangerous weapon.

Other examples of Smith's false testimony include his claim that he did not attempt to enter the Capitol building when he pushed forward in the Tunnel. The Government presented the following Facebook exchange between Smith and M.H. on January 6, 2021 (Ex. 811.13):



**Messages between** ███████████ **& Tommy Smith**

1/6/2021 ███████████ You still in DC boy

1/6/2021: Yeah we're still here, we just got pushed off the Capitol by the military police and the Capitol Police got pepper sprayed several times and beat up by the cops and got to be some cops asses but we're still here

1/6/2021 ███████████:

1/6/2021 ███████████: Was that you on the inside the building fighting with the cops and s****

1/6/2021 ███████████: It looked like you on tv

1/6/2021 Tommy Smith: Yep

1/6/2021 ███████████:

1/6/2021 Tommy Smith: Because we wanted to go inside&the cops didn't want us to

1/6/2021 ███████████: I hear you brother

1/6/2021 ███████████: Be careful brother

1/6/2021 Tommy Smith:

*Image 8*

When asked what he meant when he said, "we wanted to go inside & the cops didn't want us to," Smith claimed that he was using speech-to-text and his phone mistakenly recorded what another rioter near him was saying. Smith had no further explanation as to how speech-to-text also sent the message and later typed-and-sent the blue thumbs up.

III.    THE CHARGES

On March 15, 2023, a federal grand jury returned a superseding indictment charging Thomas Smith with eleven counts, including, 18 U.S.C. § 1512(c)(2), 18 U.S.C. § 111(a) and (b), 18 U.S.C. § 231(a)(3), 18 U.S.C. §§ 1752(a)(1, 2, and 4) and (b)(1)(A), and 40 U.S.C. §§ 5104(e)(2)(D and F). On, May 5, 2023, Smith was convicted of those offenses following a jury trial.

IV.    STATUTORY PENALTIES

Smith now faces sentencing on 18 U.S.C. § 1512(c)(2), 18 U.S.C. § 111(a) and (b), 18 U.S.C. § 231(a)(3), 18 U.S.C. §§ 1752(a)(1, 2, and 4) and (b)(1)(A), and 40 U.S.C. §§ 5104(e)(2)(D and F).

As noted by the Presentence Report issued by the U.S. Probation Office, Smith faces up to 5 years imprisonment and a fine up to $250,000 fine on Counts One and Two; 20 years of imprisonment and a $250,000 fine for Counts Three and Six; 8 years imprisonment and a $250,000 fine on Counts Four and Five; 10 years imprisonment and a $250,000 fine for Counts 10-12; and 6 months imprisonment and a $5,000 fine for Counts 13 and 14. Finally, Smith faces restitution and mandatory special assessments of $100 for Counts 1-6 and 10-12, and assessments of $10 for Counts 13 and 14.

### V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The PSR correctly calculates the guidelines for Group 1, consisting only of Count One, Group 2, consisting of Counts Two and Four, and Group 4, consisting only of Count Five.

In its explanation of Group 3, the PSR fails to include a Guidelines analysis for Counts Three, Ten, Eleven, and Twelve. For Count Three, the PSR merely states that USSG §2J1.2 applies. *See* PSR ¶¶ 50-80.[2] The full Guidelines analysis for Count Three, the lead count in this case, follows:

Count Three: 18 U.S.C. § 1512(c)(2)

| Base offense level: | 14 | U.S.S.G. § 2J1.2(a) |
|---|---|---|
| Specific Offense Characteristic | +8 | U.S.S.G. § 2J1.2(b)(1)(B): "If the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice, increase by 8 levels." |
| | | For purposes of this enhancement, the "administration of justice" is synonymous with "official proceeding" as defined in 18 U.S.C. § 1515(a)(1), which in the Capitol riot cases refers to a "proceeding before the Congress," § 1515(a)(1)(B). |

---

[2] Sections 1B.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3. The PSR does not follow these steps. It concludes (*see* PSR ¶¶ 74-80) that Count Three groups with others but does not set forth the Guidelines calculation separated for each count as required under U.S.S.G. § 1B1.1(a)(4).

| | | |
|---|---|---|
| | | There are multiple theories for application of this offense characteristic based on U.S.S.G. § 1B1.3 which encompasses both the defendant's own acts or omissions and those whom the defendant aided, abetted, counseled, commanded, induced, procured, or willfully caused. § 1B1.3(a)(1). It also includes "all harm that resulted" from the defendant's acts or the acts of others engaged in jointly undertaken criminal activity with the defendant." § 1B1.3(a)(3).<br><br>Smith threatened to cause property damage in the Tunnel when he hit the window with his flagpole five times. Smith also threatened to cause physical injury since the window could have shattered onto the officers behind it. His push through the doors with other rioters also constituted a threat to cause physical injury, especially because he was pushing through the doors at the same time that another rioter was spraying the officers with what appeared to be a chemical spray. Smith also threatened to cause physical injury during the three assaults he committed against officers, including the Count Four assault in which he pushed against officers on the Upper West Terrace around 4:20 p.m.; the Count Five assault in which he kicked Officer Rowley to the ground; and the Count Six assault in which he attacked Officer Campanale using the metal pole.  Regarding the Count Six assault, Officer Campanale testified that he was concerned that he could have suffered a concussion or worse from Smith's assault.<br><br>Smith threatened physical injury to officers and damage to property, as discussed above, in his attempts to obstruct the certification of the 2020 Presidential election. Smith testified that he knew the Certification of the Presidential election was taking place on January 6, 2021, before the Congress. His statements on Facebook made it clear that he wanted to prevent that certification from occurring ("Stop the Steal"). *See, e.g.,* Exhibit 811.16. |
| Specific Offense Characteristic | +3 | U.S.S.G. § 2J1.2(b)(2): "the offense resulted in substantial interference with the administration of justice."<br><br>For purposes of this enhancement, the "administration of justice" is synonymous with "official proceeding" as defined in 18 U.S.C. § 1515(a)(1), which in the Capitol riot cases refers to a "proceeding before the Congress, § 1515(a)(1)(B). |

| | | |
|---|---|---|
| | | The official proceeding of Congress's Joint Session, which was required by the Constitution and federal statute, had to be halted while legislators were physically evacuated for their own safety.<br><br>This adjustment is appropriate here because Smith participated in the violence at the front of the riot in two important areas, the Tunnel and the Terrace. USCP Captain Carneysha Mendoza testified that the Certification could not proceed until these areas were cleared of rioters. |
| Chapter Three Adjustment | +6 | U.S.S.G. § 3A1.2(c)(1): "in a manner creating a substantial risk of serious bodily injury, the defendant, knowing or having reasonable cause to believe that a person was a law enforcement officer, assaulted such officer during the course of the offense."<br><br>During the course of Smith's efforts to obstruct an official proceeding, i.e., Congress's certification of the 2020 Presidential election, Smith committed multiple aggravated assaults of officers, including assaulting Officer Campanale. Officer Campanale was clearly identified as a police officer; he was wearing a full MPD uniform and helmet and was standing in line with many other uniformed officers, some carrying shields clearly marked "POLICE." Accordingly, Smith had reasonable cause to believe Officer Campanale was a law enforcement officer.<br><br>Additionally, the assault against Officer Campanale with a metal pole was done in a manner creating a substantial risk of serious bodily injury. Smith picked a metal pole-like object off of the ground and threw it, hitting Officer Campanale and another officer in the head. Officer Campanale testified that he was scared that the object could have caused him a concussion or worse. Though Officer Campanale wore a helmet, this metal object could have impaled him if it struck him in an unprotected area. Officer Campanale stood on a set of stairs and could have fallen several feet had he lost consciousness or his footing. The officer behind Officer Campanale visibly flinched and retreated a step when the metal object hit them in the face shield or helmet. This officer could have also suffered serious bodily injury. |
| Chapter Three Adjustment | +2 | U.S.S.G. § 3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of |

| | | conviction and any relevant conduct; or (B) a closely related offense." |
|---|---|---|
| | | Smith provided materially false testimony under oath when he claimed that he did not intend to enter the Capitol building through the Tunnel doors. *See* U.S.S.G. §3C1.1 n.4(B). Pushing into the Capitol itself around 3:03 p.m. is a significant act that obstructed the official proceeding because it occupied many officers who could have been helping clear other rioters from inside the building. When presented with his Facebook statement, "we wanted to go inside & the cops didn't want us to," Smith testified falsely that his phone mistakenly recorded what another rioter near him was saying. Smith had no explanation as to how speech-to-text also sent the message and later typed-and-sent the blue thumbs up. *See also* Smith's additional falsehoods, listed above. |
| Total | 33 | |

This analysis of Count Three is significant because it changes the offense level for Group 3—which should be 33.

For Counts Ten, Eleven, and Twelve, the PSR identifies the correct guidelines but does not conduct the full analysis. Those Guidelines analyses follow:

Count Ten: 18 U.S.C. § 1752(a)(1), (b)(1)(A)

| Cross Reference | See below. | U.S.S.G. § 2B2.3(c)(1): "If the offense was committed with the intent to commit a felony offense, apply § 2X1.1 in respect to that felony offense, if the resulting offense level is greater than that determined above." |
|---|---|---|
| Base Offense Level (adjusted) | 25 (from Count Three) | U.S.S.G. § 2X1.1(a): "The base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." <br><br> Smith entered the restricted area of the Capitol complex for the purpose of obstructing the official proceeding—that is, stopping Congress from doing its work. The substantive offense is thus Count Three. Accordingly, the guideline for Count Three (U.S.S.G.§ 2J1.2) applies here: |

16

|  |  | Base offense level: **14** - U.S.S.G.§ 2J1.2(a)<br><br>Specific Offense Characteristic: **+8**<br><br>U.S.S.G. § 2J1.2(b)(1)(B): (Threatening physical injury to a person or property damage)<br><br>Specific Offense Characteristic: **+3**<br>U.S.S.G. § 2J1.2(b)(2): (Substantial interference with the administration of justice)<br>Total: **25**<br><br>*See* Count Three above for detailed explanations of the applicability of the specific offense characteristics in U.S.S.G.§ 2J1.2. |
|---|---|---|
| Chapter Three Adjustment | +6 | U.S.S.G. § 3A1.2(c)(1): "in a manner creating a substantial risk of serious bodily injury, the defendant, knowing or having reasonable cause to believe that a person was a law enforcement officer, assaulted such officer during the course of the offense."<br><br>*See* the U.S.S.G. § 3A1.2(c)(1) description in Count Three. |
| Chapter Three Adjustment | +2 | U.S.S.G. § 3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense."<br><br>*See* the list of instances of false testimony in the narrative above. |
| Total | 33 | |

Count Eleven: 18 U.S.C. § 1752(a)(2), (b)(1)(A)

| Cross Reference | See below | U.S.S.G. § 2A2.4(c)(1): "If the conduct constituted aggravated assault, apply § 2A2.2 (Aggravated Assault)." |
|---|---|---|
| Base Offense Level | 14 | U.S.S.G. § 2A2.2 (a) |
| Specific Offense Characteristic | +4 | U.S.S.G. § 2A2.2(b)(2)(B): "a dangerous weapon (including a firearm) was otherwise used." |

|  |  | The Jury's guilty verdict on Count Eleven established that Smith used or carried a dangerous weapon. *See* 18 U.S.C. § 1752(b)(1)(A) (punishing the defendant for "during and in relation to the offense, us[ing] or carri[ng] a deadly or dangerous weapon or firearm"). In this case, Smith used a metal pole as a dangerous weapon when he assaulted Officer Campanale on restricted Capitol grounds. *See* U.S.S.G. § 1B1.1 cmt. n.1(E). |
|---|---|---|
| Chapter Three Adjustment | +6 | U.S.S.G. § 3A1.2(c)(1): "in a manner creating a substantial risk of serious bodily injury, the defendant, knowing or having reasonable cause to believe that a person was a law enforcement officer, assaulted such officer during the course of the offense."<br><br>*See* the U.S.S.G. § 3A1.2(c)(1) description in Count Three. |
| Chapter Three Adjustment | +2 | U.S.S.G. § 3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense."<br><br>*See* the list of instances of false testimony in the narrative above. |
| Total | 26 | |

Count Twelve: 18 U.S.C. § 1752(a)(4), (b)(1)(A)

| Cross Reference | See below | U.S.S.G. § 2A2.4(c)(1): "If the conduct constituted aggravated assault, apply § 2A2.2 (Aggravated Assault)." |
|---|---|---|
| Base Offense Level | 14 | U.S.S.G. § 2A2.2 (a) |
| Specific Offense Characteristic | +4 | U.S.S.G. § 2A2.2(b)(2)(B): "a dangerous weapon (including a firearm) was otherwise used."<br><br>*See* the U.S.S.G. § 2A2.2(b)(2)(B) description in Count Eleven. |
| Chapter Three Adjustment | +6 | U.S.S.G. § 3A1.2(a), (b)<br><br>The victims of Smith's physical violence include MPD Officers Rowley and Campanale, who are government officers.   Smith's conduct was motivated by their status as police officers who were |

|  |  | doing their job, attempting to clear the rioters from the Capitol building and grounds.<br><br>Alternatively, the adjustment applies pursuant to U.S.S.G. § 3A1.2(c)(1): "in a manner creating a substantial risk of serious bodily injury, the defendant, knowing or having reasonable cause to believe that a person was a law enforcement officer, assaulted such officer during the course of the offense."<br><br>*See* the U.S.S.G. § 3A1.2(c)(1) description in Counts Ten and Eleven. |
| Chapter Three Adjustment | +2 | U.S.S.G. § 3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense."<br><br>*See* the list of instances of false testimony in the narrative above. |
| Total | 26 |  |

Since Group 3 (including Count Three) should have an offense level of 33, the PSR's multiple count adjustment calculation is wrong. *See* PSR ¶ 87. Under U.S.S.G. § 3D1.4(a) "the Group with the highest level" counts as "one Unit," and under U.S.S.G. § 3D.14(b), the analysis must "[d]isregard any Group that is 9 or more levels less serious than the Group with the highest offense level." Accordingly, Group 3 (offense level 33) counts as one unit, and Groups 1, 2, and 4 (offense levels 20, 22, and 22, respectively), must be disregarded. Under the table set out in U.S.S.G. § 3D1.4, when there is only 1 unit then the Combined Offense Level is the offense level applicable to the group with the highest offense level. Here Group 3, with an offense level of 33, is the group with the highest offense level. Thus, the combined offense level is 33.

The U.S. Probation Office calculated the Smith's criminal history as category II, which the government does not dispute. PSR ¶ 99. Accordingly, based on the government's calculation of the Smith's total adjusted offense level at 33, his Guidelines imprisonment range is 151 to 188 months' imprisonment.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.   Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Smith's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Intending to obstruct the certification, Smith attempted to break a window and breach the Capitol in the Tunnel. On the Terrace, he assaulted three different officers. Smith's assaults were each more violent than the last, culminating in an assault with a dangerous weapon on Officer Campanale. The nature and circumstances of Smith's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 168 months of incarceration, a $19,495 fine, $2000 in restitution, and a special assessment of $920.

### B.  The History and Characteristics of the Defendant

Smith has a significant and disturbing history of arrest and conviction which weighs in favor of a lengthy period of incarceration. The more recent cases are recounted here:

- In 2011, Smith was convicted of Careless Driving and Driving under the Influence. PSR ¶ 97. Notably, he has an active warrant for failure to pay the fine.

- Smith was arrested in November 2021 and convicted of Contributing to the Delinquency of a Minor in May 2022. Smith was originally charged with Child Abuse without Bodily Harm, and the disturbing details are recounted in the PSR at ¶ 98.
- On March 24, 2021, Smith was arrested in Mississippi and charged with Embezzlement by a Public Employee—a felony. This case is pending.

Smith's violent crimes on January 6 were not an isolated event in an otherwise law-abiding life. His felony criminal history demonstrates a lack of respect for others and for the law. This history weighs heavily in favor of a lengthy term of incarceration.

### C.       The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Smith's criminal conduct on January 6 was the epitome of disrespect for the law. "We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power." *United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20.

### D.       The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[3] The demands of general

---

[3] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this defendant also weighs heavily in favor of a lengthy term of incarceration.

Smith's violence against law enforcement of January 6 escalated throughout the riot: from attempted property damage, to pushing, to kicking Officer Rowley in the back, to hitting Officer Campanale in the head with a metal pole. According to Smith, he had a firearm with him at the Capitol. Smith's disturbing pattern of violence must be stopped. The Court's sentence must deter Smith from attacking officers who stand in his way in the future, and also protect the public who those officers serve.

Smith's statements before, during, and after January 6 show that he relishes political violence. Shortly before assaulting the Capitol, Smith posted militaristic memes showing his willingness to commit violence in support of former President Trump's bid to overturn the 2020 election results. *See* Ex. 206.20 ("Americans, willing to cross a frozen river to kill you in your sleep on Christmas. Totally not kidding. We've done it before.") and 209.1 (depicting the "Trump Army" as Spartan warriors, Smith added "Its (sic) coming"). He recruited other "able-bodied" Americans to join his crusade to D.C. to stop the certification. Ex. 811.16. Smith described any violence caused by rioters at the Capitol as politically justified—"Patriots stood together and battled the tyrannical cops." Ex. 811.27. He expressed pleasure in seeing the mob pull an officer away from the police line, Ex. 807.9, and was glad to have the opportunity to "beat cops (sic)

asses." Ex. 807.12.

After the riot, Smith was proud of all he had accomplished. He posted that he took his "battle flag" up to the "top of the Capitol steps" and that "it was covered with teargas blood sweat tears ripped from end-to-end." Ex. 811.2.

Throughout his testimony, Smith expressed no remorse. He maintained that the rioters' violence was justified and that the officers used excessive force. Smith attempted to emphasize self-serving phrases from his Facebook messages and posts while falsely claiming that incriminating phrases were spoken by others, captured, and sent by his phone's voice-to-text. 5/1/23 Trial Tr. at 129-130. When confronted with Exhibit 807.12, which shows his affinity for violence toward the officers, Smith claimed that the message was "flawed" and continued to deny taking ownership of his words. 5/1/23 Trial Tr. at 166-167. The Court highlighted one of Smith's most blatant falsehoods—when he testified that he merely "tapped" on the glass in the Tunnel to rescue a trapped rioter. The Court found this testimony to be "totally disingenuous." 5/5/23 Trial Tr. at 19. The Court's sentence must not only deter Smith's violent conduct, but also the disrespect he showed for the Court by testifying such consistent and flagrant dishonesty.

### *Smith raised funds based on his crimes on January 6*

Before trial, Smith and Wren raised money through a crowd-sourcing platform called GiveSendGo.com. This money was ostensibly for their legal defense, but Smith was represented throughout trial by federal public defenders. Smith created a joint fundraiser titled "Save our Patriots" which raised at least $34,800 for Smith and Wren. The site states: "The funds from this campaign will be received by Thomas Smith." See *Image 9* below.



*Image 9* – GiveSendGo.com Screenshot taken on May 8, 2023

Since the trial, Smith raised an additional $2,285 on a fundraiser titled "Support for

Patriot Thomas Smith and Family." See *Image 10* below.



*Image 10* – Captured on October 6, 2023



*Image 11* – Captured on October 2, 2023

This page is still active and states that the funds will "help with things [Smith] may need but more importantly things for his family." See *Image 11*. It characterizes Smith's conduct as follows: "we were assaulted by police officers on numerous occasions and were forced to defend [ourselves] and others from tyrannical police that were viciously beating and in several cases murdering our fellow Patriots." *Id*.

The Court should not allow Smith to profit from his felony conduct. This GiveSendGo page, like Smith's testimony, insists that he was a hero, and the officers defending the Capitol were "tyrants." To deter Smith and other like him, the Court should fine him $19,495—half of the amount he raised for himself and his cousin, pre-trial, plus the entire amount he raised since his conviction. If Smith can prove that he transferred more than half of the $34,800 to his cousin, the Court should decrease the fine accordingly.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national

26

sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.      Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing

judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[4]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[5]

---

[4] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

Like Smith, Thomas Webster was convicted at trial of assault on an officer with a dangerous weapon, and Judge Mehta sentenced him to 120 months of incarceration. *United States v. Webster*, 21-cr-208-APM, (D.C. Dist., September 14, 2022). Smith's case is more aggravated than Webster's because he was convicted of obstructing an official proceeding, a 20-year maximum felony, and of three separate assaults and two separate civil disorder felonies. While Webster's lone assault may have been more violent than any of Smith's, Smith's three assaults escalated in violence and culminated in an attack with a dangerous weapon that could have seriously injured Officer Campanale. Like Smith, Webster testified at trial and attempted to blame his officer victim for using excessive force. But Smith's testimony was even more disingenuous than Webster's because he also denied obvious conduct—attempting to break the window in the Tunnel—and falsely claimed that his Facebook statements were not his but merely speech-to-text mistakes. While Webster's conduct was aggravated by the fact that he wore body armor and brought a pistol, it was also mitigated by his lack of criminal history. Smith, on the other hand, has significant criminal history placing him in category II and also claimed that he brought a pistol to the Capitol. See Image 8.

Another similar case is *United States v. Patrick Edward McCaughey III*. 21-cr-40-TNM, (D.C. Dist., April 24, 2023). McCaughey was also convicted at trial of obstruction of an official proceeding, civil disorder, and multiple assaults including an assault with a dangerous weapon. McCaughey viciously attacked an officer by pinning him with a stolen police shield, and Judge McFadden sentenced McCaughey to 90 months of incarceration. While Smith's assaults may be slightly less aggravated, the McCaughey case included mitigating factors that Smith's does not. McCaughey is young, expressed remorse, and had no criminal history.

The government's recommendation in this case will not cause any unwarranted sentencing disparities because it is within the guidelines and accounts for the significant aggravating factors in Smith's case, including his false testimony, criminal history, and escalating violent acts against officers.

## VII.    RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110

Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Since Smith was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C.

31

2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[6]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require Smith to pay $2,000 in restitution for his convictions on Counts One-Six and Ten-Twelve. This amount fairly reflects Smith's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have

---

[6] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

### VIII.   FINE

Smith's sentencing guidelines level subjects him to a maximum fine of $350,000. *See* U.S.S.G. § 5E1.2. In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); U.S.S.G. § 5E1.2(d). In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public." *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

A fine is appropriate in this case because Smith capitalized on his crime at the Capitol on January 6—which undoubtedly "intrigues" the public like few crimes do. *Id*. As noted above, Smith raised at least $34,800 on a page he posted on GiveSendGo titled "Save our Patriots". See *Image 9*. Since Smith received this $34,800, the Court should fine him this full amount—minus any transfers he made to Wren, who incurred legal fees. The onus should be on Smith to convince the Court that he transferred some or all of this $34,800 to his cousin. The government's recommended fine of $19,495 represents half of this amount, assuming Smith transferred the other half to Wren.

Smith also raised at least $2,285 on a GiveSendGo page that was posted following his convictions at trial. See *Images 10 and 11*. On that page, Smith is characterized as a "patriot" who

was "unfairly convicted of things he did not do." *Image 11*. These funds went to Smith, and Smith alone. Since Smith did not pay for his legal representation in this case, the Court should fine him for the $2,285 raised on this page. These funds are included in the government's recommended fine.

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 168 months jail, a $19,495 fine, $2000 restitution, and a special assessment of $920.


Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:    _/s/ Tighe R. Beach_____
TIGHE R. BEACH
CO Bar No. 55328
Assistant United States Attorney
601 D Street NW
Phone: (240) 278-4348
tighe.beach@usdoj.gov